IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

No. 5:10-CR-184-BO

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | O R D E R |
| | ) | |
| JAVIER LUVIANO-VEGA, | ) | |
| | ) | |

This matter is before the Court on Defendant's several Motions to Dismiss (DE 36, 37, 39) as well as Defendant's Motion to Suppress (DE 42). For the reasons set forth below, defendant's Motions to Dismiss and his Motion to Suppress are DENIED.

BACKGROUND

On May 3, 2010, Wilson County Sheriff's Office (WCSO) Deputy Cazares was on patrol just after midnight when he heard gunshots nearby. As Deputy Cazares approached the area, he heard additional gunshots. After calling for backup, Cazares then parked near the location of the shooting. Deputy Cazares then observed a black Sports Utility Vehicle ("SUV") speed away from the scene. Deputy Cazares then began pursuing the SUV and he was ultimately joined by other officers. The SUV eventually stopped and Cazares got out of his patrol car and ordered the SUV's driver out of the vehicle. The defendant emerged, and Cazares smelled alcohol on his breath. For his own safety, Cazares indicated his intention to pat down the defendant for weapons. The defendant voluntarily replied that he had a rifle in the back seat of the SUV. Deputy Cazares observed the rifle in plain view on the floorboard. The defendant claimed that another person had shot at him. The defendant refused breath testing, and resisted when the

officers tried to handcuff him and place him in a patrol vehicle. Eventually, the officers succeeded in subduing the obdurate defendant. The weapon recovered from the SUV was a .223 rifle with four rounds in the magazine. Another officer at the scene of the original shooting found six spent .223 caliber casings.

On June 9, 2010, the defendant was charged in a two count indictment with being a felon in possession of a firearm and ammunition in violation of 18 U.S.C. §§ 922(g)(1) and 924 (Count One); and with being an illegal alien in possession of a firearm and ammunition, 18 U.S.C. § 922(g)(5) (Count Two). In support of these charges, the government alleges that (1) on July 19, 1999, the defendant pled guilty in Wilson County, North Carolina to Possession with the Intent to Manufacture, Sell and Deliver a Schedule IV Controlled Substance–a Class I felony pursuant to N.C. Gen Stat. § 90-95(A)(1); and (2) the defendant is an illegal alien.

The defendant now challenges the Indictment arguing that (1) Counts One and Two must be dismissed because the operative statutes[1] violate the Commerce Clause of Article I, Section 8 of the Constitution; (2) Count Two must be dismissed because the operative statute[2] violates the right to bear arms as defined by the Second Amendment of the Constitution; and (3) Count One must be dismissed because the defendant has not been convicted of a "crime punishable by imprisonment for a term exceeding one year" in light of the Supreme Court's recent holding in *Carachuri-Rosendo v. Holder*, 130 S. Cit. 2577 (2010). Defendant also has filed a Motion to Suppress evidence and statements.

---

[1] 18 U.S.C. §§ 922(g)(1), 924; 18 U.S.C. § 922(g)(5).

[2] 18 U.S.C. § 922(g)(5) (2010).

## DISCUSSION

I. Commerce Clause Challenge

*United States v. Lopez*, 514 U.S. 549 (1995) held that Congress unconstitutionally exceeded its authority under the Commerce Clause, U.S. Const., art. I § 8, cl. 3, by enacting the Gun Free School Zones Act of 1990, 18 U.S.C.. § 922(q). In holding that Congress overreached its Commerce Clause power, the Court found that the challenged law was "a criminal statute that by its terms [had] nothing to do with "commerce" or any sort of economic enterprise, however broadly one might define those terms." *Lopez*, 514 U.S. at 561. Moreover, the Court observed that § 922(q) lacked any "jurisdictional element which would ensure, through case-by-case inquiry, that the firearm possession in question affects interstate commerce." *Id.* at 561.

However, the *Lopez* decision does not undermine the constitutionality of 18 U.S.C. § 922(g) as defendant asserts. Section 922(g) has withstood a bevy of similar Commerce Clause challenges before the Fourth Circuit Court of Appeals. *See, e.g., United States v. Wells*, 98 F.3d 808, 809 (4th Cir. 1996) (dispensing with a Commerce Clause challenge to § 922(g) similar to the instant case because, unlike the statute at issue in *Lopez*, § 922(g) satisfies the "minimal nexus" that the Commerce Clause demands).

The defendant has not made the Court aware of any facts distinguishing the instant case from settled precedent. As *Wells* and its progeny make clear, Congress did not exceed its Commerce Clause power in enacting § 922(g). Accordingly, the Court finds that the defendant's challenge to the Indictment on Commerce Clause grounds is without merit.

II. Right to Bear Arms Challenge

The Defendant next challenges Count Two of the Indictment on the grounds that the

operative statute, 18 U.S.C. § 922(g)(5), violates the right to bear arms as secured by the Second Amendment of the Constitution. The defendant relies on Justice Breyer's dissenting opinion in *District of Columbia v. Heller*, 127 S. Ct. 2783 (2008) and on *McDonald v. Chicago*, 130 S.Ct. 3020 (2010). However, the defendant concedes that no case-law supports his position.

The Court is not aware of any precedent recognizing an illegal alien's right to bear arms. Defendant's reliance on *Heller* for that proposition is misplaced. *Heller* held that the Second Amendment secures an individual right to bear arms unconnected from militia service. *Heller*, 127 S. Ct. at 2788-2816. But the decision in no way identified a specific right of aliens–legal or not–to bear arms. The *Heller* court answered a much narrower question and did not attempt an exhaustive taxonomy of the specific individuals who can and cannot claim Second Amendment protection. See *Heller*, 127 S. Ct. at 2817 n.26 ("We identify these presumptively lawful regulatory measures only as examples; our list does not purport to be exhaustive). *Heller* therefore provides no support for defendant's contention that aliens illegally present in the United States possess a Second Amendment right to bear arms. The Court is aware of no precedent that support defendant's contention and is left to conclude that such a right does not exist.

Having established that an illegal alien possesses no right to bear arms under the Second Amendment, the Court finds that Congress can properly prohibit an alien's possession of firearms under its broad immigration and naturalization powers. Congress has nearly plenary power to pass legislation and adopt policies affecting aliens, immigration and naturalization. *Matthews v. Diaz*, 426 U.S. 67, 77 (1976). This power enables Congress to pass laws that would run afoul of the Constitution if those same laws were applied to legal citizens. *Id.* at 80. Congress's immigration power is not limitless; aliens are guaranteed some due process rights under the Fifth and Fourteenth Amendments. *Id.* at 77-79. However, as discussed above, an

alien cannot claim a right to bear arms under the Constitution. Section 922(g)(5), which criminalizes the possession of firearms by illegal aliens, is therefore a valid exercise of Congressional power. Consequently, the Court declines defendant's Motion to Dismiss Count Two on Second Amendment Grounds.

III.   Prior Felony Convictions

The defendant next argues that pursuant to the recent Supreme Court holding in *Carachuri-Rosendo v. Holder*, 130 S. Ct. 2577 (2010), his prior North Carolina Class I felony conviction is not in fact a "crime punishable by imprisonment for a term exceeding one year" under 18 U.S.C. § 922(g)(1).

The Court's analysis is controlled by *United States v. Harp*, 406 F.3d 242 (4th Cir. 2005). *Harp* held that in the context of a violation of 18 U.S.C. § 922(g)(1), "a prior North Carolina conviction was for 'a crime punishable by imprisonment for a term exceeding one year,' if *any* defendant charged with that crime could receive a sentence of more than one year." *Harp*, 406 F.3d at 246 (citing *United States v. Jones*, 195 F.3d 205, 206–07 (4th Cir. 1999)) (emphasis in original).

Applying the *Harp* rule to the present case, the defendant's prior North Carolina Conviction for Possession with the Intent to Manufacture, Sell and Deliver a Schedule IV Controlled Substance is a "crime punishable by imprisonment for a term exceeding a year" because a defendant charged with that crime could receive a sentence of imprisonment for a term exceeding a year. N.C. Gen. Stat. § 15A-1340.17(c)-(d). Under North Carolina's Structured Sentencing regime, a defendant with the worst possible record who is convicted of a Class I felony can receive a maximum sentence of fifteen months imprisonment. *Id.* Thus, the

defendant has been convicted of a "crime punishable by imprisonment for a term exceeding one year" as required under 18 U.S.C. § 922(g)(1).

*Carachuri-Rosendo v. Holder* does not disturb the validity of *Harp*, as defendant argues. In *Carachuri-Rosendo*, the government sought to prevent Carachuri-Rosendo from seeking discretionary cancellation of removal from the United States on the basis that he had been convicted of an "aggravated felony." 130 S. Ct. at 2580, 2582. An "aggravated felony" for immigration law purposes includes a state drug offense that is punishable by a term of imprisonment for more than one year. *Id.* at 2581. The defendant, a resident of Texas, was twice convicted of simple misdemeanor drug possession. *Id.* at 2583. Texas law authorized a second simple drug possession to be punishable by not less than 15 days but not more than two years imprisonment. *Id.* at 2581 n.4. For the second simple possession conviction to be eligible for felony enhanced punishment, Texas law, like federal law, required a prosecutor to charge the existence of the prior simple possession conviction before trial or guilty plea, and give the defendant an opportunity to challenge the validity of the prior conviction to be used to enhance the current conviction. *Id.* at 2581-82 (citing 21 U.S.C. § 851(a)(1)). Texas did not seek an enhancement for the defendant's second conviction. *Id.* at 2582-83.

The Supreme Court concluded that Texas's failure to enhance the defendant's sentence based on the second simple possession conviction precluded the government from arguing that the defendant had been convicted of a felony. *Id.* at 2589. Under the North Carolina Structured Sentencing regime, however, there is no additional duty on the part of the prosecutor to charge the defendant – a defendant's exposure to imprisonment of more than one year is automatically factored into the sentencing scheme based on his/her original conviction. If Carachuri-Rosendo had been enhanced as a recidivist, his crime would have been punishable by a term exceeding

one year, that is, by his exposure to a guideline range of 15 days to two years. In other words, the enhancement would have been sufficient to deem him to have had an aggravated felony, regardless of the actual sentence he received. He would have then been convicted of "an offense punishable by . . . imprisonment for a term exceeding one year, regardless of whether such offense is specifically designated as a felony and *regardless of the actual sentence imposed*." See USSG §4B1.2, comment.(n.1) (emphasis added). The Supreme Court did not deny that had Carachuri-Rosendo been properly charged as a recidivist he would have been punishable by a term exceeding one year. 130 S. Ct. at 2589-90. The Court held that because he was not so charged, he was not convicted of a felony. *Id.*

By contrast, the defendant here was automatically placed in the category of persons subject to felony imprisonment upon his conviction of a class I felony, a class of offenses punishable by imprisonment for more than one year. More importantly, in *Carachuri-Rosendo*, the Supreme Court did not address the North Carolina Structured Sentencing scheme, nor did it address what it means to be "punishable by a term of imprisonment exceeding one year" in that context. Rather, it focused on the importance of the procedures in placing the defendant in the eligible category for exposure to felony imprisonment. Thus, Carachuri-Rosendo is distinguishable from this case, and the suggestion that the Fourth Circuit will find that *Carachuri-Rosendo* changed Fourth Circuit precedent is premature.

The defendant has also raised the issue of multiplicitous prosecution, invoking the case of *United States v. Dunford*, 148 F.3d 385 (4th Cir. 1998). Defendant's argument is without merit. *Dunford* stands for the proposition that a defendant cannot be convicted of more than one violation of 18 U.S.C. § 922(g) for the same conduct. However, *Dunford* does not limit the government's ability to pursue alternative theories based on the same conduct, and defendant

cites no authority to the contrary.

Accordingly, the Court finds that the defendant has been convicted of a "crime punishable by imprisonment for a term exceeding one year" for purposes of 18 U.S.C. § 922(g). The Court further finds that defendant's contention that the Indictment is multiplicitous is without merit.

IV. Motion to Suppress

Defendant moves to suppress the .223 rifle recovered from his SUV as well as his statements to Deputy Cazares. The defendant contends that Deputy Cazares obtained the rifle and defendant's statements at the scene in violation of the Fourth Amendment because the Deputy lacked even reasonable suspicion to stop the defendant's vehicle. The Defendant also contends that Cazares obtained defendant's statements in violation of the Fifth Amendment by failing to provide *Miranda* warnings to the defendant.

A. Deputy Cazares' *Terry* Stop

*Terry v. Ohio,* 392 U.S. 1 (1968), held that a police officer may subject an individual to an investigatory detention or "*Terry* Stop," provided that the officer first has a reasonable suspicion, supported by specific and articulable facts that the suspect is involved in a crime. *Id.* at 20-21. Whether an officer possesses reasonable suspicion is a fact-bound inquiry based upon the totality of the circumstances; even individual factors which might otherwise be consistent with innocent behavior can, when taken together, give rise to reasonable suspicion. *United States v. Arvizu,* 534 U.S. 266, 273 (2002); *United States v. Moore,* 817 F.2d 1105, 1107 (4th Cir. 1987). Analyzing a Terry stop involves "a dual inquiry: 'whether the officer's action was justified at its inception, and whether it was reasonably related in scope to the circumstances which justified the interference in the first place.'" *United States v. Rusher,* 966 F.2d 868, 875 (4th Cir.),

cert. den., 506 U.S. 926 (1992) (quoting *Terry v. Ohio*, 392 U.S. 1, 20 (1968)).

A traffic stop, like the one in the instant case, is a "seizure" for purposes of the Fourth Amendment, and is analogous to a "Terry stop." *United States v. Sullivan*, 138 F.3d 126, 131 (4th Cir. 1998). Like any *Terry* stop, analyzing a traffic stop involves "a dual inquiry: 'whether the officer's action was justified at its inception, and whether it was reasonably related in scope to the circumstances which justified the interference in the first place.'" *United States v. Rusher*, 966 F.2d 868, 875 (4th Cir.), cert. den., 506 U.S. 926, 121 L. Ed. 2d 266, 113 S. Ct. 351 (1992) (quoting *Terry v. Ohio*, 392 U.S. 1, 20, 20 L. Ed. 2d 889, 88 S. Ct. 1868 (1968)).

In the instant case, Deputy Cazares' "reasonable suspicion" that criminal activity involving the defendant was afoot can hardly be questioned. The incident occurred in the early morning hours of May 3, 2010. Deputy Cazares heard gunshots. He went to the vicinity of those gunshots and there he heard additional gunshots. Cazares then saw a black SUV rapidly flee the scene. Cazares chased the SUV for a distance of approximately two miles. Although there might have been opportunities for Cazares to have briefly lost sight of the vehicle, this alone does not vitiate Cazares' reasonable suspicion that criminal activity was afoot involving the vehicle that he was chasing. The circumstances of this case rationally lead to the conclusion that a *Terry* stop was valid based upon "information known to the officer and any reasonable inferences to be drawn at the time of the stop." *United States v. Arvizu*, 534 U.S. 266 (2002).

Having observed the defendant's vehicle speed away from the place where he heard multiple gunshots, Cazares had not just reasonable suspicion but probable cause to stop the SUV for speeding and reckless driving violations. Once he stopped the defendant's vehicle, Cazares correctly deduced that the defendant may be armed and dangerous; the Deputy had, after all, just witnessed the defendant's vehicle rapidly flee the area where multiple gunshots were heard.

Based upon the reasonable suspicion that the defendant was armed, Cazares was entitled to conduct a limited frisk and search for weapons for the safety of himself and the other officers on the scene. *United States v. Elston*, 479 F.3d 314, 319 (4th Cir 2007). Further, "a protective search is authorized even if the suspect is under police restraint at the time the search is conducted, because the suspect may be able to escape such restraint, or may later regain access to the vehicle if he is not arrested." *Elston*, 479 F.3d at 320.

By the defendant's own admission, once he heard that the officers intended to frisk him, the defendant volunteered that there was a firearm in the SUV.. (DE 3) Deputy Cazares asked the defendant where the weapon was located, "to which the Defendant replied that it was in the back." (DE 3). As stated above, the rifle was in plain view. This entire brief encounter is entirely within the legitimate scope of securing a weapon for officer safety. The officers' conduct does not run afoul of the Fourth Amendment as defendant asserts.

B. The *Miranda* Warnings

The defendant next contends that Deputy Cazares obtained statements in violation of the Fifth Amendment by failing to advise him of his rights under *Miranda v. Arizona*, 384 U.S. 436 (1966). The defendant's position ignores the fundamental legal axiom that *Miranda* warnings are not required during a valid *Terry* stop, provided that the officer does not exceed the permissible scope that *Terry* permits. *See, e.g., United States v. Leshuk*, 65 F.3d 1105, 1108 (4th Cir. 1995). Having established, above, that the officers' initial *Terry* stop was authorized, the only issue that must be answered is whether the detention and search of the defendant was "reasonably related in scope to the circumstances which justified the interference in the first place." *Terry*, 392 U.S. at 20.

Here, the facts establish that Deputy Cazares and his fellow officers acted well within the narrowly circumscribed bounds that *Terry* mandates. The encounter occurred in the early morning hours. Deputy Cazares heard several gunshots and upon arriving at the location from which the gunshots emanated, he witnessed the defendant depart the scene at a high rate of speed. When Cazares stopped the vehicle and ordered the defendant out of it, he smelled alcohol on the defendant's breath. Under these circumstances, Cazares was authorized to "take such steps as [are] reasonably necessary to protect [his] personal safety and to maintain the status quo during the course of the stop." *United States v. Hensley*, 469 U.S. 221, 235 (1985). Cazares' indicated his intention to pat down the defendant for weapons, at which point, the defendant voluntarily indicated that he had a rifle in the back of the SUV. The facts simply do not support the position that Cazares exceeded the permitted scope of a *Terry* stop. Defendant's contention that *Miranda* warnings were required under the circumstances contravenes settled case law. *See United States v. Jackson*, 280 F.3d 403, 405-06 (4th Cir. 2002). The officers' conduct, therefore, did not run afoul of the Fifth Amendment as defendant asserts.

For the reasons stated above, Defendant's several Motions to Dismiss as well as Defendant's Motion to Suppress are DENIED.

SO ORDERED, this 19 day of September, 2010.

*Terrence Boyle*

TERRENCE W. BOYLE

UNITED STATES DISTRICT JUDGE